

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| SIMON ZAPATA,<br>    PLAINTIFF,<br><br>VS.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br>    DEFENDANT. | §<br>§<br>§<br>§   CIVIL ACTION NO. 4:13-CV-340-Y<br>§<br>§<br>§<br>§<br>§ |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

## FINDINGS AND CONCLUSIONS

## I. STATEMENT OF THE CASE

Plaintiff Simon Zapata ("Zapata") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claims for a period of disability and disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"). In March 2010, Zapata applied for disability insurance benefits and supplemental security income, alleging that his disability began on February 5, 2010. (Tr. 13, 129-139.)

After his applications for benefits were denied initially and on reconsideration, Zapata requested a hearing before an administrative law judge ("ALJ"). (Tr. 13, 65-74, 77-84.) The

ALJ held a hearing on June 15, 2011, and issued an unfavorable decision on December 9, 2011. (Tr. 13-21, 26-54.) On March 5, 2013, the Appeals Council denied Zapata's request for review, leaving the ALJ's decision as the final decision of the Commissioner in his case. (Tr. 1-4.) Zapata subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern DIB and SSI benefits. *See* 20 C.F.R. Pt. 404 (2012) (DIB); 20 C.F.R. Pt. 416 (2012) (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and the SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity." 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the claimant must not be presently working at any substantial gainful activity. *Id.* §§ 404.1520(b), 416.920(b). "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit." *Id.* §§ 404.1572, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. *Id.* §§ 404.1520(c), 461.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the

Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to her past relevant work. *Id.* §§ 404.1520(f), 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(g), 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).[1] At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of her existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to

---

[1] Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding her physical and mental limitations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* §§ 404.1520(a)(4), 416.920(a)(4). At step four, the claimant's RFC is used to determine if the claimant can still do her past relevant work. *Id.* §§ 404.1520(e), 416.920(e). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* §§ 404.1520(e), 416.920(e).

determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## I.   ISSUE

In his brief, Zapata presents the following issues:

(1) Whether the ALJ failed to weigh all of the medical opinions of State Agency Medical Consultant ("SAMC") Matthew Wong, Ph.D. ("SAMC Wong") and SAMC Charles Lankford, Ph.D. ("SAMC Lankford");

(2) Whether the ALJ properly weighed the opinion of Zapata's treating physician; and

(3) Whether Zapata could actually perform the jobs identified by the vocational expert ("VE") at the hearing before the ALJ.

(Plaintiff's Brief ("Pl.'s Br.") at 1.)

## II.   ALJ DECISION

In her December 9, 2011 decision, the ALJ found that Zapata had not engaged in any substantial gainful activity since February 5, 2010, Zapata's onset date of disability, and that he met the disability insured status requirements of the SSA through December 31, 2014. (Tr. 15.) At Step Two, the ALJ found that Zapata suffered from severe impairment of schizophrenic disorder. (Tr. 15.) At Step Three, the ALJ held that Zapata's impairments did not meet or equal the severity of any impairment contained in the Listing. (Tr. 16.) As to Zapata's residual functional capacity ("RFC"), the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple routine work. The claimant cannot work with exposure to the public, dangerous machinery or heights. He can maintain work at this level.

(Tr. 16-17 (emphasis omitted).) At Step Four, the ALJ opined, based on the RFC assessment and other findings, that Zapata was not able to perform his past relevant work. (Tr. 19.) Finally, at Step Five, the ALJ found that, based on Zapata's age, education, work experience, and RFC, he

4

retains the ability to perform a significant number of jobs in the national economy.  (Tr. 19-20.)

Thus, the ALJ concluded that Zapata was not and had not been disabled from February 5, 2010

through the date of the decision.  (Tr. 20.)

## III.  DISCUSSION

### A.  Opinions of State Agency Medical Consultants

In his brief, Zapata first argues that the ALJ erred when she failed to mention or weigh

the opinions of SAMC Wong and SAMC Lankford.  (Pl.'s Br. at 4-6.)  Specifically, Zapata

argues:

> The ALJ's error in not weighing Dr. Wong's and Dr. Lankford's opinions
> prejudiced the Plaintiff's right to a fair administrative review.  The ALJ found that
> Plaintiff retained the residual functional capacity ("RFC") to perform work at all
> exertional levels but with the nonexertional limitations of: limited to simple and
> routine work; and no exposure to the public, dangerous machinery or heights.
> With this RFC, the ALJ ultimately concluded the Plaintiff was not disabled
> because he could still perform the jobs of a dishwasher, a laundry worker and
> bakery worker.  At the hearing, the vocational expert ("VE") was asked by the
> Plaintiff's representative how the occupational base would be affected if a
> hypothetical individual were markedly limited in: 1) responding to changes in a
> routine work setting; 2) responding to supervisors and coworkers; 3) completing a
> normal workday or workweek without interruptions from psychologically based
> symptoms; and 4) performing at a consistent pace without an unreasonable
> number and length of rest periods.  With any and all of these limitations, the VE
> testified that the hypothetical individual would have trouble maintaining
> employment.  Both Dr. Wong and Dr. Lankford opined that Plaintiff was
> moderately limited (as opposed to markedly limited) in all four areas.
> Nevertheless, limitations in these four areas negatively impacts the occupational
> base.  Had the ALJ included these limitations in her found RFC, a different
> outcome could have resulted.  Thus, reversal of the ALJ's Decision is necessary.

(Pl.'s Br. at 5-6 (internal citations omitted).)

RFC is what an individual can still do despite his limitations.[2]  SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  It reflects the individual's maximum ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  *Id.*; *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A regular and continuing basis is an eight-hour day, five days a week, or equivalent schedule.  SSR 96-8p, 1996 WL 374184, at *2.  RFC is not the least an individual can do but the most.  *Id.*  The RFC is a function-by-function assessment, with both exertional and nonexertional[3] factors to be considered, and is based on all of the relevant evidence in the case record.  *Id.* at 3-6.  The responsibility for determining a claimant's RFC lies with the ALJ.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).  The ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence.  SSR 96-8p, 1996 WL 374184, at *7.

In making an RFC assessment, the ALJ must consider all symptoms and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence.  *See* 20 C.F.R. §§ 404.1529, 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at 5.  Additionally, an ALJ is to consider all medical opinions in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from non-examining sources) at both the administrative hearing and Appeals Council

---

[2] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

[3] Exertional capacity addresses an individual's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5. Each function must be considered separately, but the final RFC assessment may combine activities. *Id.* Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength," including mental limitations. *Id.* at *6.

levels of administrative review.  20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p, 1996 WL 34180, at *2-4 (S.S.A. July 2, 1996).  Pursuant to SSR 96-6p, the ALJ and the Appeals Council are not limited by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions.  SSR 96-6p, 1996 WL 374180, at *2.

Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from non-examining sources) at both the administrative hearing and Appeals Council levels of administrative review.  20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-6p, 1996 WL 374180, at *2-4 (S.S.A. July 2, 1996).  Pursuant to SSR 96-6p, the ALJ and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions.  SSR 96-6p, 1996 WL 374180, at *2.

In a Mental Residual Functional Capacity Assessment ("MRFCA") form dated July 15, 2010, SAMC Wong opined in Section I, which is titled "Summary Conclusions," that Zapata was moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting.  (Tr. 448-49.)  In Section III, which is titled "Functional Capacity Assessment," SAMC Wong stated, "Claimant able to understand,

remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact w[ith] others, and respond to changes." (Tr. 450.) In addition, in a Psychiatric Review Technique ("PRT") form also dated July 15, 2010, SAMC Wong also opined that Zapata suffered from a "psychotic disorder nos" that did not satisfy the diagnostic criteria of section 12.03 of the Listing. SAMC Wong found that Zapata was mildly restricted in his activities of daily living and had moderate difficulties in maintaining social functioning and in concentration, persistence, or pace. (Tr. 454, 462.) SAMC Lankford, in a Case Assessment Form dated November 10, 2010, affirmed SAMC Wong's PRT form and, in a Case Assessment Form dated November 16, 2010, affirmed SAMC Wong's MRFCA form. (Tr. 466, 468.)

As stated above, the ALJ found that Zapata had the RFC to perform the full range of work at all exertional levels but that he was limited to simple routine work and could not work with exposure to the public, dangerous machinery, or heights. (Tr. 16-17.) Zapata is correct that the ALJ did not discuss the opinions of SAMC Wong and SAMC Lankford in her decision. However, even assuming the ALJ erred in properly evaluating the opinion of the SAMCs, courts "have declined to reverse and remand on procedural grounds when it is clear that the procedural error did not compromise the decision-making process." *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (holding, in part, that ALJ's failure to expressly consider findings of SAMC was harmless as there was substantial evidence in the record supporting the ALJ's decision).[4] *See, e.g., Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988); *Mays v. Bowen*, 837

---

[4] The Court notes that there is a different, albeit similar, standard of review when there is a violation of a social security ruling as opposed to a violation of a regulation. Violation of a regulation invokes a "harmless error" analysis whereas violation of a ruling invokes a "prejudice" analysis. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (stating that "[p]rejudice and harmless error analysis, although similar in substance, are different procedurally"). "Remand for failure to comply with a [social security] ruling . . . is appropriate when a complainant affirmatively demonstrates ensuant prejudice." *McNair*, 537 F. Supp. 2d at 838 (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). "A claimant can show prejudice by showing that adherence to the ruling might have led to a different decision." *Id.* (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th

F.2d 1362, 1364 (5th Cir.1988) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."); *Turney v. Astrue,* No. 4:08-CV-189-Y, 2009 WL 980323, at *5 (N.D. Tex. Apr. 9, 2009) ("The ALJ should have addressed the findings of the state agency medical consultants, but his failure to do so was harmless.").

In this case, as noted by the Commissioner, any error in the ALJ's failure to discuss the opinions of SAMC Wong and SAMC Lankford is harmless error as their opinions were *less* limiting that the ALJ's actual RFC determination. In other words, the ALJ found that Zapata was capable of performing work with more limitations than those found by the SAMCs; thus, the ALJ's failure to address the SAMCs' opinions could not have altered the result. As to Zapata's argument that the ALJ failed to consider SAMC Wong's findings that Zapata was "moderately" limited in several functional areas in light of the VE's testimony regarding "marked" limitations in these areas, the Court notes that "moderately" limited is distinctly different than "markedly" limited.[5] Based on the foregoing, any error of the ALJ in analyzing the opinions of SAMCs Wong and Lankford was harmless; thus, remand is not required.

## B. Opinion of Treating Physician

Next, Zapata argues that the ALJ failed to properly weigh the opinion of Chandrakant Patel, M.D. ("Dr. Patel"), Zapata's treating physician. (Pl.'s Br. at 6.) Zapata claims that the ALJ failed to follow the law when finding that Dr. Patel's opinions conflicted with the objective medical evidence by not going through the factors set forth in 20 C.F.R. 404.1527(c). (Pl.'s Br. at 7-9.) In addition, Zapata argues that one of the reasons the ALJ cited for rejecting Dr. Patel's

---

Cir. 2000)). "Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Id.*

[5] Section 12.00(C) of the Listing defines "marked" as a degree of limitation that is more than moderate, but less than extreme. 20 C.F.R., pt. 404, Subpt. P, App. 1 § 12.00(C); 20 C.F.R. § 416.920a(c)(4).

opinions, *i.e.*, that Zapata's ability to work is contradictory to his past work history, is "based upon faulty logic and is not a 'good reason.'" (Pl.'s Br. at 10.) Zapata further states, "Contrary to the ALJ's statement that Dr. Patel's 'assessment of the claimant's ability to work is contradictory to his past work history,' the fact that Plaintiff had more than 10 employers in the past 4 years overwhelmingly evidences the fact that the Plaintiff cannot maintain work on a regular and consistent basis." (Pl.'s Br. at 10.) Zapata states that the ALJ failed to follow the holding in *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) by not crediting Zapata's actual work history and Dr. Patel's opinion controlling weight to find that Zapata could not maintain work. (Pl.'s Br. at 10-11.)

In a Mental Impairment Questionnaire dated July 6, 2011, Dr. Patel stated that he treated Zapata once every five to six weeks and diagnosed Zapata with, *inter alia*, chronic paranoid schizophrenia. (Tr. 245; *see* Tr. 485-92.) Dr. Patel further opined that he anticipated Zapata's impairments or treatment would cause Zapata to be absent from work more than three times a month and that his ability to do work-related activities on a day-to-day basis in a regular work setting was "fair"—fair defined as the ability to function in this area being "seriously limited." (Tr. 488.) Dr. Patel also found that Zapata had the "fair" mental ability and aptitude to do the following: (1) remember work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) make simple work-related decisions; (4) ask simple questions or request assistance; (5) interact appropriately with the general public; (6) maintain socially appropriate behavior; (7) travel in unfamiliar places; and (8) use public transportation. Furthermore, Dr. Patel stated that Zapata had "poor" or no ability to do the following: (1) maintain attention for a two hour segment; (2) maintain regular attendance and be punctual within customary, usually strict tolerances; (3) sustain an ordinary routine without special

supervision; (4) work in coordination with or proximity to others without being unduly distracted; (5) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (9) respond appropriately to changes in a routine work setting; (10) deal with normal work stress; (11) understand, remember, and carry out detailed instructions; (12) set realistic goals or make plans independently of others; and (13) deal with stress of semiskilled and skilled work. (Tr. 489-90.) Dr. Patel also opined that Zapata: (1) was slightly restricted in his activities of daily living; (2) had moderate difficulties in maintaining social functioning; (3) had frequent deficiencies in concentration, persistence, or pace; and (4) had repeated (three or more) episodes of deterioration or decompensation. (Tr. 491-92.)

As to treatment of Zapata by Dr. Patel, the ALJ stated:

> A review of the medical evidence of record discloses that the claimant has a history of outpatient treatment from 2005 through 2010 for schizophrenia, treated with medication management (1F, 4F-5F). Mr. Zapata's medication management continued into 2010 (4F). In multiple months the claimant was out of medication (4F/6-7, 9, 30) and he failed to show for multiple appointments (4F/5, 10, 17, 21, 24, 27, 33, 37, 46). On August 18, 2010, the claimant's lability was rated as a two and he was frequently noted to be groomed, cooperative, alert and with normal thinking (4F/7, 11, 15, 18, 22, 25). In January and July 2009 he reported that he was doing well and sleeping well (4F/31, 38). On December 3, 2008, the claimant denied any hallucinations (p 40).
>
> In May 2008 Mr. Zapata did not want to take his medications (5F/1). At this time he was alert, cooperative, with an appropriate affect, and with normal speech and thought. In April 2010 the claimant reported off-and-on symptoms with medication compliance (11F/1). Mr. Zapata denied any increase in his symptoms. With compliance, he was found to be groomed, cooperative, with normal speech and thought and with an appropriate affect (p 3). In October 2010,

Mr. Zapata stated that he was doing well and sleeping well (p 7). In May 2011 his symptoms were again described as off-and-on (12F/1).[6]

. . . .

Dr. Chandrakant H. Patel, a treating physician, opined on July 6, 2011 completed [sic] a form on which he stated that the claimant had poor to no ability to perform numerous work tasks such as maintaining attention for a two hour segment, sustaining work without special supervision, , [sic] accepting instructions and responding to normal criticism, getting along with co-workers or peers, and dealing with normal work stress. He found that the claimant had poor to no ability to understand and remember detailed instructions (13F). The undersigned cannot accept the opinion of this doctor because it conflicts with the objective medical evidence as set forth in this decision.  Moreover, this assessment of the claimant's ability to work is contradictory to his past work history.  While there is no evidence objective [sic] that his mental condition significantly deteriorated after he stopped working, he was able to maintain a skilled job for a year despite his schizophrenia. Clearly then, Dr. Patel's opinion as to the claimant's work related limitations has no merit. The undersigned has considered this opinion as that of a treating physician but does not accept it as it is contrary to the more probative evidence of record.

(Tr. 17-18 (footnote inserted).)

In making his determination, the ALJ further stated:

Although the documentary record establishes an underlying medical condition capable of producing some limitations in overall functioning, the substantial evidence fails to corroborate the degree of restrictions and limitations as alleged by the claimant.  Pertinent to this determination are his conservative progress notes which show that Mr. Zapata has a history of inconsistent periods of seeking medical treatment for what he has described as a chronic disabling impairment, his sustained medication usage involving Zyprexa, a history of non compliance, and the failure of objective medical evidence that has produced clinical findings consistent with and supportive of both the severity and frequency of the claimant's subjective complaints and allegations.

Although the claimant has engaged in non compliance with prescribed medication usage and multiple failures to show for many scheduled appointments, with compliance Mr. Zapata has reported that he was doing well and sleeping well.  It is probative that the case record fails to establish any good reason for the claimant's failure to follow his prescribe[d] regimen. The claimant has reported having the stressors of having to pay child support, a failure to become employed,

---

[6] The above described treatment records were from Tarrant County Mental Health Mental Retardation—Arlington Outpatient Clinic, where Dr. Patel was one of several doctors that treated Zapata.

and having to pay off his college loans (2E/4). His reactions to these types of stressors are normal for any individual.

Despite alleging symptoms of schizophrenia on a constant basis the claimant's progress notes show that since his hospitalization of 2001 Mr. Zapata has sought and received only outpatient treatment consisting of medication management on the basis of once every two months basis [sic] (11E, 1F, 4F-5F). His medication has remained Zyprexa, which suggests that Dr. Patel believed that this medication was adequate in controlling the claimant's symptoms. Moreover, Dr. Patel reduced the claimant's dosage from 7mg to 5mg (11E/1, 12E/6). The claimant's impairment has also not limited Mr. Zapata's daily activities. He has reported that he has engaged in a wide range of daily activities to include cleaning, caring for his personal needs, laundry, shopping, going to the movies and church, going to parties, paying bills, watching television, using a computer, interacting with friends and family, driving and reading (testimony, 2E, 7E and 11E). His ability to read, watch television and use a computer suggests strongly that the claimant retains adequate or better attention and concentration for sustained periods. As noted the claimant has been able to complete a certificate for computer electronics and to maintain skilled work despite his schizophrenia.

(Tr. 18-19.)

Controlling weight is assigned to the opinions of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); *Muse*, 925 F.2d at 790. Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § [404.1527(c)]." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). Under the statutory analysis of 20 C.F.R. §§ 404.1527 and 416.927, the ALJ must evaluate the following: (1) examining relationship; (2) treatment relationship, including the length, nature, and extent of the treatment relationship, as well as the frequency of the examination(s); (3) supportability; (4) consistency; (5) specialization; and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 416.927(c); SSR 96-6p, 1996 WL 364180, at *3; SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).[7]

Assuming, without deciding, that the ALJ was required to go through the factors set forth in 20 C.F.R. §§ 404.1529(c) and 416.927(c) when analyzing the opinion of Dr. Patel, Zapata's treating physician, the Court concludes that the ALJ did properly evaluate such opinion. To begin with, it is clear that the ALJ was aware of his obligations in analyzing the opinions of a treating physician as he specifically stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927." (Tr. 17.) As to factors one and two under which the ALJ evaluates the examining and treatment relationship between Zapata and Dr. Patel, the ALJ noted that Dr. Patel was Zapata's treating physician and referenced various

---

[7] Pursuant to *Newton*, however, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) only if there is no reliable medical evidence from another treating or examining physician that controverts the treating specialist. *Newton*, 209 F.3d at 455–57. An ALJ does not have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," as well as in cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507–11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in *Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.").

14

exhibits in the record that contained treatment records from when Zapata was examined by Dr. Patel. (*See* Tr. 17-18.)

As to factors three, four, and six under which the ALJ evaluates the supportability and consistency of physician's opinion as well as any other factors that "tend to support or contradict the opinion," the ALJ explained that she was not accepting Dr. Patel's opinions in the July 6, 2011 Mental Impairment Questionnaire because: (1) such opinions conflicted with the objective medical evidence in the record and were contradictory to Zapata's past work history; and (2) Zapata was able to maintain a skilled job for a year despite his schizophrenia. (Tr. 18.) As to factor five, it is clear that the ALJ knew Dr. Patel was treating Zapata for his schizophrenia and referenced documents in the record where it indicated Dr. Patel was an "M.D." (Tr. 17-18; *see* Tr. 492.)

As set forth above, the ALJ can reject the opinions of a treating physician for good cause. In this case, the ALJ explained that she was not accepting Dr. Patel's opinions in the July 6, 2011 Mental Impairment Questionnaire because such opinions conflicted with the objective medical evidence in the record, were contradictory to Zapata's past work history, and Zapata was able to maintain a skilled job for a year despite his schizophrenia. (Tr. 18.) The ALJ further explained that "the substantial evidence fails to corroborate the degree of restrictions and limitations as alleged by the claimant" as the treatment notes show "Zapata has a history of inconsistent periods of seeking medical treatment," Zapata has been consistently treated with Zyprexa; and Zapata has a history of non-compliance. (Tr. 18.) Because the ALJ properly considered the opinion of Dr. Patel and went through the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in analyzing such opinions, and substantial evidence supports the ALJ's decision, the Court concludes that the ALJ did not err.

As noted above, Zapata also claims that it was error for the ALJ to cite as a reason for rejecting Dr. Patel's opinion the fact that Zapata's ability to work is contradictory to his past work history. In this way, Zapata argues that a "closer inspection of the Plaintiff's work history bolster's [sic] the fact that the Plaintiff's mental functional capacity prevent him from maintaining work on a regular and consistent basis." (Pl.'s Br. at 10.)   The Court notes, however, that the medical record indicates that Zapata has received treatment for his mental disorder since at least February 2005. (Tr. 246.) Thus, Zapata worked for over five years with an impairment he now alleges is disabling, and it was not improper for the ALJ to consider this contradiction as one reason for rejecting Dr. Patel's Mental Impairment Questionnaire.   *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (stating that "the record reflects that Vaughan was able to, and did, work for several years while suffering from ailments she now asserts are disabling").   While Zapata was employed by over twenty-five different employers between 1995 through 2010 and by ten different employers between 2007 and 2010 (Pl.'s Br. at 10), such facts do not negate the fact that Zapata was working during a time period in which he was being treated for an impairment he claims is now disabling.

## C. **VE Testimony**

Zapata also argues that he could not have performed the jobs identified by the VE at Step Five with the RFC determination found by the ALJ.[8] (Pl.'s Br. at 13.) As noted above, the ALJ

---

[8] When, as here, the ALJ reaches his disability determination at Step Five, it means that the claimant established a *prima facie* case of disability and the burden shifted to the Commissioner to show that other work exists in the national economy that the claimant can perform despite his impairments. *See Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987); *Allsbury v. Barnhart*, 460 F. Supp. 2d 717, 720 (E.D. Tex. 2006). When determining whether the claimant could adjust to alternative work that is within his RFC and that exists in significant numbers in the national economy, the ALJ may consult several sources, including the *Dictionary of Occupational Titles* ("DOT") and a VE. *See* 20 C.F.R. § 404.1566(a), (d), (e); 20 C.F.R. § 416.966(a), (d), (e). The availability of more than one approved source, however, presents the risk of conflict between the DOT's job descriptions and the VE's opinion regarding both the claimant's ability and the jobs' availability. *Gaspard v. Soc. Sec. Admin, Comm'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009).

found that Zapata could work at all exertional levels but he was limited to simple, routine work and could not work with exposure to the public, dangerous machinery, or heights. (Tr. 17.) The ALJ further found at Step Five, relying on the testimony of the VE, that Zapata could perform the occupations of dishwasher, laundry worker, and bakery worker. (Tr. 20.)

Zapata argues that he could not have performed the jobs of dishwasher, which is actually titled kitchen helper in the *Dictionary of Occupational Titles* ("DOT"), and laundry worker identified by the VE, because both require a reasoning development level ("RDL") of two in the DOT, which requires the ability to carry out detailed but uninvolved written or oral instructions. (Pl.'s Br. at 12.) Zapata claims that there is a conflict[9] between the VE's testimony and the

---

The Fifth Circuit has held that where there is a conflict between the VE's testimony and the DOT, the ALJ may rely upon the VE's testimony, provided that the record reflects an adequate basis for doing so. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). Because this type of conflict surfaced somewhat frequently, the Commissioner issued SSR 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *Id.*; SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). Specifically, the ruling unambiguously establishes the ALJ's affirmative duty to bring to light and explain any possible conflict between the VE's testimony and the DOT. When there is a conflict, neither the DOT nor the VE evidence automatically "trumps" the other. *Id.* The conflict must be resolved by determining whether the VE's explanation is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information. *Id.* The ALJ must explain in his decision how any conflict that has been identified was resolved. *Id.*

[9] Before SSR 00-4p became effective, the Fifth Circuit decided *Carey* to resolve whether VE testimony that conflicts with the DOT can provide substantial evidence to support the Commissioner's decision. *Carey*, 230 F.3d at 143-45 (identifying the various positions taken by other circuits); *see Johnson v. Astrue*, No. 11-3030, 2012 WL 5472418, at *8 (E.D. La. Oct. 5, 2005). The Fifth Circuit joined the majority of circuits in adopting a "middle ground approach," under which "neither the DOT nor the vocational expert testimony is per se controlling." *Carey*, 230 F.3d at 145-47. However, under this approach, the ALJ's "discretion to choose between conflicting evidence is not unfettered" and in part depends on the nature of the conflict. *Romine v. Barnhart*, 454 F. Supp. 2d 623, 627 (E.D. Tex. 2006); *see Carey*, 230 F.3d at 146-47.

*Carey* identified three types of conflict and limited its holding to "implied or indirect" conflict, which is characterized as being tangential in nature and unapparent until further inference is made. *Carey*, 230 F.3d at 145-47; *see Johnson*, 2012 WL 5472418, at *9 ("A tangential, implied or indirect conflict occurs when there is no direct conflict between the expert testimony regarding the exertional or skill level required for a particular job and the [DOT], but additional inferences can be drawn (and the plaintiff is asking the court to draw them on appeal) that the [DOT] description may conflict with the [VE's] testimony that the claimant is capable of performing a particular job."). In *Carey*, the claimant had only one arm, and the jobs in question required manual dexterity. *Carey*, 230 F.3d at 146. The court decided the conflict was implied or indirect because it did not even become apparent until "further inference is made that the jobs require manual dexterity with, not one, but two hands." *Id.* The court held that, to the extent the VE's testimony impliedly or indirectly conflicts with the DOT, "the ALJ may rely upon the [VE]'s testimony provided that the record reflects an adequate basis for doing so." *Id.* In so holding, the court reasoned that a claimant who did not raise implied conflict at the administrative hearing cannot be permitted to thereafter peruse the record in search of such conflict to present as reversible error. *Id.* at 146-47.

DOT. (Pl.'s Br. at 11.)  In addition, Zapata argues that he could not have performed the job of bakery worker identified by the VE because, according to the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), the job of bakery worker has "occasional" exposure to moving mechanical parts, which is not permitted in the ALJ's RFC determination.[10]  (Pl.'s Br. at 12-13.)

As to Zapata's claim that he could not have performed the jobs of dishwasher ("kitchen helper")[11] and laundry worker[12] because both require an RDL of two, the Court notes that an

---

*Carey* distinguished implied or indirect conflict from two other types of conflict: (1) the "direct and obvious" conflict, which exists when the VE's testimony conflicts with the DOT, and (2) the "less obvious" conflict, which arises when the VE's testimony "creates a conflict or discrepancy between the ALJ's [RFC] determination . . . and the DOT job descriptions." *Id.* at 145-46; *see Johnson*, 2012 WL 5472418, at *8 (stating that there are two ways VE's testimony can create a direct conflict: (1) when the VE testifies that a particular job requires a particular exertional or skill level when the DOT expressly provides that the job requires a different exertional level and (2) when the VE's testimony places the ALJ's RFC finding or the claimant's specific impairments in conflict with the exertional or skill level or the specific skills required for the identified jobs in the DOT).  Courts have continued to treat both the "direct and obvious" conflict and the "less obvious" conflict as "direct conflicts," a category of conflicts separate and distinct from the implied or indirect conflict. *See Graham v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-2133-N (BH), 2009 WL 3199382, at *7 (N.D. Tex. Oct. 2, 2009); *Augustine v. Barnhart*, No. 1:00-CV-749, 2002 WL 31098512, at *9 (E.D. Tex. Aug. 27, 2002) (referring to obvious conflict and less obvious conflict as "direct conflict scenarios").

[10] The DOT and its supplement, the SCO, "comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs." *Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608-09 (E.D. Tex. 2009); *see Conaway v. Astrue*, No. 3:07-CV-0906-BD, 2008 WL 4865549, at *5 (N.D. Tex. Nov. 10, 2008) ("The DOT, along with a companion volume—[SCO]—contain descriptions of the requirements for thousands of jobs in the national economy."); *see also* DOT xv (rev. 4th ed. 1991); SCO at vii; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990); *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp. 2d 607, 612 (E.D. Tex. 2009) ("The DOT and its supplement, [SCO], comprise a comprehensive listing of job titles in the United States, along with detailed description of requirements for each job . . . .").

[11] Kitchen helper, which is listed in the DOT under section 318.687-010, is described as follows:

Performs any combination of following duties to maintain kitchen work areas and restaurant equipment and utensils in clean and orderly condition: Sweeps and mops floors.  Washes worktables, walls, refrigerators, and meat blocks.  Segregates and removes trash and garbage and places it in designated containers.  Steam-cleans or hoses-out garbage cans.  Sorts bottles, and breaks disposable ones in bottle-crushing machine.  Washes pots, pans, and trays by hand.  Scrapes food from dirty dishes and washes them by hand or places them in racks or on conveyor to dishwashing machine.  Polishes silver, using burnishing-machine tumbler, chemical dip, buffing wheel, and hand cloth.  Holds inverted glasses over revolving brushes to clean inside surfaces.  Transfers supplies and equipment between storage and work areas by hand or by use of handtruck.  Sets up banquet tables.  Washes and peels vegetables, using knife or peeling machine.  Loads or unloads trucks picking up or delivering supplies and food.

RDL of two is defined as "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." Contrary to Zapata's argument that he could not perform jobs at the RDL of 2 because such jobs are not "simple routine work" as required by the ALJ's RFC determination, Courts have repeatedly found that jobs with a RDL of 2 are not necessarily inconsistent with limitations to simple instructions and routine tasks. *See, e.g., Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 613–14 (E.D. Tex. 2009); *Gaspard v. Soc. Sec. Admin. Comm'r*, 609 F.Supp.2d 607, 617 (E.D. Tex. 2009); *Pete v. Astrue*, No. 08–CV–774, 2009 WL 3648453, at *5–6 (W.D. La. Nov. 3, 2009) ("Contrary to plaintiff's argument, the fact that instructions may be various, furnished in multiple forms, or detailed does not preclude them from being simple. Instead, the classification of these jobs as 'unskilled' indicates they are by definition simple."); *Dugas v. Astrue*, No. 1:07–CV–605, 2009 WL 1780121, at *6 (E.D. Tex. June 22, 2009) ("A limitation of performing 1–2 step instructions in a simple, routine work environment does not necessarily preclude the ability to perform jobs with reasoning levels of 2 or 3.") (internal citations omitted); *Adams v. Astrue*, No. 07–CV–1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008) ("As several courts have held, reasoning level two requires the worker to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations, and appears consistent with residual functional capacity to perform simple, routine

---

DOT 318.687-010 (rev. 4th ed. 1991). It has a specific vocational preparation ("SVP") of two and is, thus, considered an unskilled job. *See* SSR 00-4p, 2000 WL 1898704, at *3 (stating that jobs having an SVP of one to two are defined as "unskilled work.")

[12] Laundry worker, which is listed in the DOT under section 361.684.014, is described as "[w]ashes and irons wearing apparel, sheets, blankets, and other linens and clothes used by employees of logging, construction, mining, or other camp, or washes uniforms, aprons, and towels in establishments supplying employees with these linens." DOT § 361.684.014 (rev. 4th ed. 1991). It has an SVP of two and is, thus, considered an unskilled job.

work tasks."). In addition, "the use of the word 'detailed' in the DOT is not equivalent to the word 'detailed' as used in the Social Security regulations." *Adams*, 2008 WL 2812835, at *3; *see Abshire v. Astrue*, No. 07–CV–1856, 2008 WL 5071891 (W.D. La. Oct. 29, 2008) (stating that the Social Security Regulations have only two categories of abilities as to understanding and remembering instructions while the DOT has six levels for measuring this ability). Thus, the Court concludes that there is no conflict and remand is not required.

As to Zapata's claim that he could not have performed the job of bakery worker because the SCO states that the job of bakery worker has "occasional" exposure to moving mechanical parts, which is contrary to the RFC determination found by the ALJ. The Court disagrees as being occasionally exposed to moving mechanical parts is not the same as being exposed to dangerous machinery. While any machine can be dangerous if improperly used, the SCO definition of the job of bakery worker does not describe the mechanical parts that a person engaging in such work might be exposed to as a "machine" or as "dangerous" as required to conflict with the ALJ's RFC determination. *See, e.g., Ridley v. Astrue*, No. H-08-3486, 2010 WL 9462578, at *11 (S.D. Tex. Nov. 30, 2010) ("[W]hile any machine can be dangerous if improperly used, the DOT definition does not describe any machines used by a security guard as "dangerous" or requiring special skill or training to prevent injury or harm.") Thus, the Court finds that no conflict exists, and remand is not required.

Moreover, even assuming there was a conflict between the VE's testimony and the information contained in the DOT and/or SCO, such a conflict is not a direct or obvious conflict; instead, it would be an implied or indirect conflict. "All kinds of implicit conflicts are possible and the categorical requirements listed in the DOT [or SCO] do not and cannot satisfactorily answer every such situation." *Adams v. Astrue*, No. CV-07-1248, 2008 WL 2812835, at *3

(W.D. La. June 30, 2008). Again, "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT [or SCO], and then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.*; *see Carey*, 230 F.3d at 142. Zapata, who was represented by an attorney at the hearing before the ALJ and whose attorney was specifically permitted by the ALJ to ask questions regarding the VE's testimony (Tr. 50-53), did not raise any such implied conflict at the administrative hearing. Consequently, Zapata will not now be permitted to peruse the record in search of a conflict to present as reversible error and, instead, is found to have waived such argument. *See, e.g., Young v. U.S. Comm'r of Soc. Sec.*, No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009).

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error

or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **August 27, 2014**, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation.  It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED August 13, 2014.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv